COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Chaney and Lorish
Argued at Richmond, Virginia


HASSAN S. WILLIAMS, S/K/A
  HASAAN S. WILLIAMS
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0138-22-2                      JUDGE CLIFFORD L. ATHEY, JR.
                                                         FEBRUARY 14, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
T.J. Hauler, Judge Designate

Stephen A. Mutnick (Winslow, McCurry & MacCormac, PLLC, on
brief), for appellant.

Victoria Johnson, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a bench trial, the Circuit Court of Chesterfield County ("trial court") convicted

Hassan S. Williams ("Williams") of possession of a firearm by a non-violent felon within ten years

of his conviction, in violation of Code § 18.2-308.2(A), and sentenced him to five years of

incarceration with three years suspended.  On appeal, Williams contends that the police illegally

searched his home and seized evidence based on a stale search warrant that lacked probable cause.

Williams also contends this search warrant cannot be saved through the good faith exception to the

warrant requirement.  Finally, Williams argues that the Commonwealth failed to prove that he

constructively possessed a firearm.  Finding no error, we affirm the trial court's decision.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. Background

In November 2019, Hanover County Sheriff's Investigator Christopher Clark ("Investigator Clark") received a tip from a "reliable" confidential informant that Williams and his associate, Christopher Harris ("Harris"), had been distributing heroin in the City of Richmond. The informant reported that he had observed Williams and Harris "resupplying heroin from a known kilogram level dealer," and indicated that another man, Aubrey Eugene Green ("Green"), had allowed Williams and Harris to package and sell heroin at his Richmond residence in exchange for receiving some of the narcotics. Also, according to the informant, Williams and Harris typically sold good quality heroin at "$120/gram, $840/¼ ounce, and $1500/ ½ ounce." Based upon the information provided by the informant, Investigator Clark, agents of the Drug Enforcement Administration ("DEA"), and local law enforcement agencies, (collectively "law enforcement") began conducting "electronic and physical" surveillance of Williams and Harris as part of a ten-month investigation into the alleged drug distribution network. Police also confirmed that Harris was dealing drugs containing heroin and fentanyl after conducting two "controlled buys" from him.

In February 2020, the Richmond Police were called to investigate a suspicious death at Green's residence after he reported finding a deceased person in a bedroom of his home. The informant subsequently confirmed that the deceased person found in a bedroom in Green's home was both a frequent heroin user and had previously acquired narcotics from Williams, Harris, and Green. In March 2020, Williams was arrested in Richmond on unrelated felony eluding and drug possession charges prompting Investigator Clark to begin surveillance of Williams. He later observed Williams living in a two-story townhouse in Chesterfield County.

By April 2020, Investigator Clark had seen Harris frequently coming and going from Williams' townhouse in Chesterfield County. During one stakeout, both Williams and Harris exited

the townhouse and went to an adjacent barbershop and convenience store, where they were observed conducting two "hand to hand drug transaction[s]."

Based on Harris' "earlier controlled buys and continued narcotics activity," Investigator Clark also began monitoring Harris' phone calls, phone records, and movements. By August 2020, Harris was engaged in a "clear pattern" of travel from his residence to Green's Richmond residence, Williams' townhouse in Chesterfield, and the previously identified convenience store near Williams' townhouse.

Hence, on August 31, 2020, Investigator Clark applied for a warrant to search Williams' townhouse. In the sworn affidavit in support of the search warrant, Investigator Clark described the "thing[s] to be searched for" as follows:

> Narcotics, Packaging materials[,] shipping materials, narcotics paraphernalia, records, receipts, notes, US Currency and ledgers. Electronic devices, such as computers, cell phones and tablets. Any digital storage devices such as SD cards, micro SD cards, hard drives, thumb drives and anything used to store digital media and the contents therein, containing the information generated by the aforementioned electronic equipment. Photographs and video, address or telephone books, indicia of occupancy, residency, rental, and for ownership of the premises to be searched, including, but not limited to, utility and telephone bills, canceled envelopes, rental, purchase, or lease agreements, registration and keys.

In the section of the affidavit labeled "material facts constituting probable cause that the search should be made," Investigator Clark wrote that: (1) since January 2010, the Hanover County Sheriff's Office had employed him as a "sworn law enforcement officer"; (2) since 2019, he had served as a "task for[ce] officer" with the DEA and had been "personally involved with over 500 drug investigations, to include users and distributors"; (3) based on this "training and experience," "[i]t is common for narcotics users and distributors to hide narcotics, contraband, and records of drug transactions in secure locations within their residences"; and (4) it is "common" for such persons to "conceal" drug paraphernalia, "handwritten notes" containing contact information for

"drug distributors or clients," and "electronic storage devices" containing similar information and "records of conversations."

Finally, Investigator Clark concluded that "based on all the aforementioned information [in the affidavit] and the continuing criminal enterprise with a highly lethal and dangerous narcotic such as heroin and [f]entanyl," there existed probable cause that "the above-described evidence will be located" at Williams' townhouse in Chesterfield County. Based on the affidavit in support of the search warrant, the magistrate concluded that there was "probable cause" to believe that the above "property" "constituted evidence of" narcotics distribution and that "the search should be made." Therefore, on August 31, 2020, the magistrate issued a warrant to search Williams' townhouse in Chesterfield County.

On September 3, 2020, law enforcement executed the warrant to search Williams' townhouse. They detained Williams and his ex-girlfriend, Sierra, while the search was being performed. On the second floor of the townhouse, law enforcement identified a "drop down, folding" ladder extending from an open "trap door" to the attic. When DEA Agent Shawn Montgomery ("Agent Montgomery") ascended the ladder into the attic, he immediately identified a loaded Century Arms 7.62 caliber rifle lying in plain view on the floor. At trial, Agent Montgomery testified that "you couldn't miss" the rifle because the attic's "insulation was pushed back" from where the gun lay beside the ladder.

After descending back down the ladder from the attic to the second floor, Agent Montgomery searched two bedrooms, the first bedroom belonging to Williams' daughter which contained only "toys" and a "small television." Agent Montgomery later testified that he did not "see any items of adult clothing, adult shoes, [or] anything belonging to an adult that was plainly obvious" inside the child's bedroom.

- 4 -

He then searched the master bedroom which contained a bed, nightstand, and a dresser where he found a collection of neatly arranged men's shoes beside the bed as well as male clothing throughout the bedroom. In the area between the bed and nightstand, Agent Montgomery observed in plain view a high-capacity "drum magazine" and "brace" for a "firearm device." When he retrieved the brace, Agent Montgomery discovered that it was attached to a "Glock 27, .40 caliber" handgun. He next searched the nightstand which contained a Ziploc bag with multiple envelopes inside bearing Williams' name. He then searched the dresser, and one of the drawers contained a bag that held $21,798 in currency which had been divided into $1,000 bundles and secured with rubber bands. Agent Montgomery also found another drum magazine and a "large and empty firearm" in the same drawer. Another dresser drawer contained male and female clothing, children's photographs, documentation, a box of .40 caliber ammunition, and a check for $720 listing Williams as payee. When questioned, Williams told police that the cash and men's clothing in the master bedroom belonged to him, however, he maintained that he had been sleeping in his daughter's bedroom because he was "homeless" and had obtained the cash through legitimate means.

Pretrial, Williams moved to suppress the Commonwealth's evidence obtained during the search of his residence based on a lack of probable cause. Following a hearing on the suppression motion, the trial court denied the motion concluding that "the totality of the circumstances" demonstrated that "there was probable cause . . . to believe that there was contraband" at Williams' residence. At the conclusion of the Commonwealth's case in chief, Williams moved to strike the evidence. The trial court denied the motion.[1] Williams subsequently renewed his motion to strike at the conclusion of all the evidence, which the trial court also denied. Williams appealed.

---

[1] At trial, the Commonwealth introduced a certified copy of a final order of May 19, 2017, from the Circuit Court of Chesterfield County convicting Williams of felony eluding and possession of a Schedule I or II controlled substance.

## II. ANALYSIS

### A. *Standard of Review*

"An appellant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact on appeal." *Taylor v. Commonwealth*, 66 Va. App. 619, 631 (2016). We review "de novo the overarching question of whether a search or seizure violated the Fourth Amendment." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021). "When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).

### B. *The trial court correctly concluded that the good faith exception applied to the warrant.*[2]

Williams argues that the trial court erroneously denied his suppression motion because the search warrant was defective and the *Leon*[3] good faith exception cannot "save" the warrant. Williams further contends the *Leon* good faith exception does not apply to this affidavit because it contained "bare bones" factual allegations and conclusions. We disagree.

"In *Leon*, the United States Supreme Court held that 'suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule.'" *Polston v. Commonwealth*, 255 Va. 500, 503 (1998) (quoting *United States v. Leon*, 468 U.S. 897, 918

---

[2] We decline to address whether the magistrate had a substantial basis to conclude that probable cause supported the warrant or whether the probable cause had expired when police executed the warrant. "The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). Here, our conclusion that the good faith exception applied to the warrant constitutes the best and narrowest grounds on this issue.

[3] *United States v. Leon*, 468 U.S. 897 (1984).

(1984)).  "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Lane v. Commonwealth*, 51 Va. App. 565, 572 (2008) (quoting *Leon*, 468 U.S. at 921).  "Under the good faith exception, '[w]here a police officer has an objectively reasonable belief that the issuing magistrate had probable cause to issue the search warrant, the officer may rely upon the magistrate's probable cause determination and the evidence will not be excluded.'"  *Id.* (quoting *Colaw v. Commonwealth*, 32 Va. App. 806, 810 (2000)).  Nevertheless, the United States Supreme Court has recognized "four circumstances" in which the good faith exception is inapplicable:

> (1) [W]hen the [magistrate] "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) when "the issuing magistrate wholly abandoned his judicial role . . ."; (3) when "an affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) when "a warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."

*Midkiff v. Commonwealth*, 54 Va. App. 323, 330 (2009) (quoting *Ward v. Commonwealth*, 273 Va. 211, 222-23 (2007), *aff'd*, 280 Va. 216 (2010).

This Court has held that "as long as there is *some* indicia of probable cause in the underlying affidavit, we will apply the good faith exception [provided that] a reasonable police officer, after assessing the facts set forth in the affidavit, could have believed the warrant was valid." *Sowers v. Commonwealth*, 49 Va. App. 588, 603-04 (2007) (quoting *Anzualda v. Commonwealth*, 44 Va. App. 764, 781 (2005) (en banc)).  Moreover, "[f]or the good faith rule to apply, the affidavit must provide *some* nexus between the evidence sought and the place to be searched."  *Id.* at 604 (emphasis added).

The affidavit contained detailed factual allegations that provided at least "*some* indicia" of probable cause to believe Williams' townhouse would contain evidence of drug dealing when police executed the search warrant. *Id.* at 603-04 (quoting *Anzualda*, 44 Va. App. at 781).  "A magistrate

is entitled to draw reasonable inferences about where incriminating evidence is likely to be found, based on the nature of the evidence and the type of offense." *Gwinn v. Commonwealth*, 16 Va. App. 972, 976 (1993). "In the case of drug dealers, evidence of ongoing criminal activity is likely to be found where the dealer resides." *Id.* According to Investigator Clark's affidavit, in November 2019, a reliable confidential informant told police that Williams and Harris were distributing heroin. The informant provided specific details of Williams' and Harris' drug operation including information concerning their supplier, the prices and quality of the heroin they sold, and that Green's house in Richmond was where they packaged and sold drugs. That same month, police also confirmed that Harris was dealing drugs containing heroin and fentanyl after conducting two "controlled buys" from Harris. In February 2020, police also discovered one of Williams' known customers deceased inside the house where Williams and Harris packaged and sold heroin. In March 2020, police arrested Williams for possession of a controlled substance, and the next month, police witnessed Williams conduct two "hand to hand" drug transactions at a convenience store immediately after meeting Harris *inside Williams' townhouse*.

In mid-August, police saw Williams leave his townhouse to meet Harris and several vehicles gathered outside Green's residence in a manner "indicative of narcotics distribution." Finally, during the ten-month period Williams was under surveillance, police confirmed that Williams lived at the Chesterfield townhouse and Harris exhibited a "clear pattern" of traveling to that residence, Green's home, and the convenience store where Williams had previously sold drugs. Those facts "were not so vague as to be conclusory or meaningless." *Anzualda*, 44 Va. App. at 786 (quoting *United States v. Carpenter*, 360 F.3d 591 (6th Cir.), *cert. denied*, 543 U.S. 851 (2004)). Rather, collectively, they support the rational inference that there was—if not "a fair probability"— at least *some* likelihood that Williams' townhouse would contain evidence of his ongoing illicit drug distribution when police executed the search warrant. *Cf. Gwinn*, 16 Va. App. at 975-76 (holding

that the magistrate could infer from defendant's repeated drug transactions that evidence of drug-dealing was in his home); *see also Sowers*, 49 Va. App. at 604 (holding that the good faith exception applied because affidavit contained at least some indicia of criminal activity satisfying probable cause and nexus requirements); *Anzualda*, 44 Va. App. at 787-88 (same). Accordingly, we hold that the trial court correctly concluded that the good faith exception applied.

C. *Rule 5A:18 bars consideration of Williams' argument that the magistrate who issued the warrant was neutral and detached.*

Williams argues that "no evidence presented at the suppression hearing" proved that the magistrate "performed his 'neutral and detached' function." However, we do not address Williams' argument that the magistrate abandoned his neutral role.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." At trial, Williams argued that the good faith exception did not apply *solely* because the warrant failed to meet the probable cause and nexus requirements. Accordingly, we decline to address Williams' separate argument that the magistrate abandoned his judicial role, which Williams raises for the first time on appeal. Williams does not invoke the exceptions to 5A:18, and this Court will not do so *sua sponte*. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc).

D. *The evidence was sufficient to support Williams' conviction.*

Williams argues that the evidence at trial failed to prove he constructively possessed any of the firearms discovered in his home. We disagree.

"A conviction for the unlawful possession of a firearm can be supported exclusively by evidence of constructive possession," whether sole or joint. *Smallwood v. Commonwealth*, 278 Va. 625, 630 (2009) (quoting *Bolden v. Commonwealth*, 275 Va. 144, 148 (2008)). Constructive possession may be established by "evidence of acts, statements, or conduct by the defendant or

other facts and circumstances proving that the defendant was aware of the presence and character of the firearm and that the firearm was subject to his dominion and control." *Id.* Although "ownership or occupancy alone is insufficient to prove knowing possession of [contraband] located on the premises or in a vehicle," other circumstantial evidence coupled with ownership or occupancy often establishes the constructive possession of such contraband. *Burchette v. Commonwealth*, 15 Va. App. 432, 435 (1992).

Here, the totality of the circumstances demonstrate that Williams constructively possessed the "Glock 27, .40 caliber" pistol in the master bedroom. First, Williams was present and living at the townhouse when police executed the search warrant. Second, police found the pistol among Williams' personal property. Williams' shoes were beside the bed where police found the gun; and the nearby nightstand contained Williams' cash and a Ziploc bag with envelopes bearing his name. The bedroom dresser also contained a check listing Williams as payee, and a box of .40 caliber ammunition matching the caliber of the Glock pistol. Williams told police that he had been sleeping in his daughter's bedroom because he was "homeless," despite claiming ownership of substantial quantities of cash discovered in the master bedroom with his clothing and other personal property. Williams also maintained that he had acquired the cash through legitimate means, although he was suspected of distributing narcotics. Given such contradictions, the trial court rationally discarded Williams' explanations as "mere fabrications to conceal his guilt." *Rollston v. Commonwealth*, 11 Va. App. 535, 547 (1991).

In sum, the foregoing evidence established that Williams constructively possessed the Glock pistol in the master bedroom. Accordingly, we hold that the trial court's rulings denying Williams' motions to strike were not plainly wrong or without evidentiary support.[4]

---

[4] We need not consider whether the evidence was sufficient to prove Williams constructively possessed the other firearms because possession of the Glock pistol is enough to support his conviction.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*